# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | ) ) ) | **MDL Case No. 1:17-md-2804** |
| | ) | **Case No. 1:18-op-45220** |
| THIS DOCUMENT RELATES TO: | ) ) | |
| | ) | **Judge Dan Aaron Polster** |
| STANDING ROCK SIOUX TRIBE, | ) ) | |
| Plaintiff, | ) ) | **TRIBAL PLAINTIFF'S SHORT FORM FOR SUPPLEMENTING COMPLAINT AND AMENDING DEFENDANTS AND** |
| v. | ) ) | **JURY DEMAND** |
| PURDUE PHARMA L.P., et al., | ) ) | |
| Defendants. | ) | |

Plaintiff submits this supplemental pleading and Amended Complaint incorporating as if fully set forth herein its own prior pleadings and, if indicated below, the common factual allegations identified and the RICO causes of action included in *Muscogee (Creek) Nation's* First Amended Complaint, (Doc. 731, 1:17-md-02804) and *The Blackfeet Tribe of the Blackfeet Indian Reservation's* Corrected First Amended Complaint (Redacted), (Doc. 9, 18-op-45749), both as pleaded and as may be amended in the future ("Tribal Bellwether Plaintiffs' pleadings"), and any additional claims asserted herein. Plaintiff also hereby amends its complaint to alter the defendants against which claims are asserted as identified below. To the extent defendants were previously sued in plaintiff's existing complaint and they are no longer identified as defendants herein, they have been dismissed without prejudice except as limited by CMO-1, Section 6(e). Doc. #: 232.

<u>INCORPORATION BY REFERENCE OF EXISTING COMPLAINT</u>

1.　　Plaintiff's Existing Complaint (No. 1:18-op-45220, Doc. #1) is expressly incorporated by reference to this Short Form as if fully set forth herein except to the extent that allegations regarding certain defendants that are not listed in section 2 below are dismissed without prejudice.

**<u>PARTIES – DEFENDANTS</u>**

2　　Having reviewed the relevant ARCOS data, Plaintiff asserts claims against the following Defendants:

Purdue Pharma L.P.; Purdue Pharma Inc.; The Purdue Frederick Company; Cephalon, Inc.; Teva Pharmaceutical Industries, Ltd.; Teva Pharmaceuticals USA, Inc.; Janssen Pharmaceuticals, Inc.; Johnson & Johnson; Ortho-McNeil-Janssen Pharmaceuticals, Inc.; Janssen Pharmaceutica, Inc.; Endo Health Solutions Inc.; Endo Pharmaceuticals Inc.; Allergan PLC; Actavis PLC; Watson Pharmaceuticals, Inc.; Watson Laboratories, Inc.; Actavis Pharma, Inc.; Watson Pharma, Inc.; Actavis LLC; Mallinckrodt PLC; Mallinckrodt LLC; McKesson Corp.; Cardinal Health, Inc.; AmerisourceBergen Corp.; AbbVie Inc.; AmerisourceBergen Drug Corporation; Anda, Inc.; Anoka LLC; D & K Healthcare Resources; Dakota Drug, Inc.; KVK-Tech, Inc.; Lannett Company, Inc.; Ligand Pharmaceuticals, Inc.; Morton Grove Pharmaceuticals, Inc.; Mylan Pharmaceuticals, Inc.; Par Pharmaceutical, Inc.; Rhodes Pharmaceuticals L.P.; Rhodes Pharmaceuticals, Inc.; Sandoz Inc.; SpecGx LLC; Sun Pharmaceutical Industries, Inc.; Thrifty Drug Stores, Inc., d/b/a Thrifty White Warehouse; Walgreen Co.; Wal-Mart Stores, Inc.; West-Ward Pharmaceuticals Corp.; White Drug 61; Zydus Pharmaceuticals (USA) Inc.; Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; and Trust for the Benefit of Members of the

Raymond Sackler Family a/k/a The "Raymond Sackler Trust."

       **I, Timothy Q. Purdon, Counsel for Plaintiff, certify that in identifying all Defendants, I have followed the procedure approved by the Court and reviewed the ARCOS data that I understand to be relevant to Plaintiff.**

       **I further certify that, except as set forth below, each of the Defendants newly added herein appears in the ARCOS data I reviewed.**

       **I understand that for each newly added Defendant not appearing in the ARCOS data I must set forth below factual allegations sufficient to state a claim against any such newly named Defendant that does not appear in the ARCOS data.**

       **The following newly added Defendants *do not appear* in the ARCOS data I reviewed:**

Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; and Trust for the Benefit of Members of the Raymond Sackler Family a/k/a The "Raymond Sackler Trust."

Dated: 08/09/2019           Signed: *s/ Timothy Q. Purdon*

### Factual Allegations Regarding Individual Defendants

2.1     At all relevant times, Purdue, which is a collection of private companies, has been controlled by members of the extended Sackler family, who are the ultimate intended beneficiaries of virtually all of Purdue's profit distributions. The individual Defendants named in this action are the remaining living Sackler family members who served on the board of Purdue Pharma, Inc. (the "Purdue board"), which functioned as the nexus of decision-making for all of Purdue.

2.2     Defendant Richard S. Sackler became a member of the Purdue Board in 1990 and became its co-chair in 2003, a position that he held until he left the board in 2018. He was also Purdue's head of research and development from at least 1990 through 1999, and its Chief

Executive Officer and President from 1999 through 2003. He resides in New York, Florida, and Texas. At all times material to this Complaint, acting alone or in concert with others, Richard Sackler formulated, directed, controlled, had the authority to control, or participated in the deceptive and unconscionable acts and practices set forth in this Complaint. As a member of Purdue's Board, he approved and oversaw deceptive and unconscionable conduct that was purposely directed at North Dakota and South Dakota and gave rise to the Standing Rock Sioux Tribe's claims as alleged in this Complaint.

2.3     Defendant Jonathan D. Sackler was a Senior Vice President of Purdue Pharma until May 2007 and a member of Purdue's Board from 1990 through 2018. He resides in Connecticut.  At all times material to this Complaint, acting alone or in concert with others, Jonathan Sackler formulated, directed, controlled, had the authority to control, or participated in the deceptive and unconscionable acts and practices set forth in this Complaint. As a member of Purdue's Board, he approved and oversaw deceptive and unconscionable conduct that was purposely directed at North Dakota and South Dakota and gave rise to the Standing Rock Sioux Tribe's claims as alleged in this Complaint.

2.4     Defendant Ilene Sackler Lefcourt was a member of Purdue's Board between 1990 and 2018. She resides in New York. At all times material to this Complaint, acting alone or in concert with others, Ilene Sackler Lefcourt formulated, directed, controlled, had the authority to control, or participated in the deceptive and unconscionable acts and practices set forth in this Complaint. As a member of Purdue's Board, she approved and oversaw deceptive and unconscionable conduct that was purposely directed at North Dakota and South Dakota and gave rise to the Standing Rock Sioux Tribe's claims as alleged in this Complaint.

2.5    Defendant Kathe A. Sackler was a Senior Vice President of Purdue Pharma until May 2007 and a member of Purdue's Board from 1990 through 2018. She resides in New York and Connecticut. At all times material to this Complaint, acting alone or in concert with others, Kathe Sackler formulated, directed, controlled, had the authority to control, or participated in the deceptive and unconscionable acts and practices set forth in this Complaint. As a member of Purdue's Board, she approved and oversaw deceptive and unconscionable conduct that was purposely directed at North Dakota and South Dakota and gave rise to the Standing Rock Sioux Tribe's claims as alleged in this Complaint.

2.6    Defendant Mortimer D.A. Sackler was a Vice President of Purdue Pharma until May 2007 and member of Purdue's Board from 1993 through 2018. He resides in New York. At all times material to this Complaint, acting alone or in concert with others, Mortimer Sackler formulated, directed, controlled, had the authority to control, or participated in the deceptive and unconscionable acts and practices set forth in this Complaint. As a member of Purdue's Board, he approved and oversaw deceptive and unconscionable conduct that was purposely directed at North Dakota and South Dakota and gave rise to the Standing Rock Sioux Tribe's claims as alleged in this Complaint.

2.7    Defendant Beverly Sackler was a member of Purdue's Board from 1993 through 2017. She resides in Connecticut. At all times material to this Complaint, acting alone or in concert with others, Beverly Sackler formulated, directed, controlled, had the authority to control, or participated in the deceptive and unconscionable acts and practices set forth in this Complaint.  As a member of Purdue's Board, she approved and oversaw deceptive and unconscionable conduct that was purposely directed at North Dakota and South Dakota and gave rise to the Standing Rock Sioux Tribe's claims as alleged in this Complaint.

2.8     Defendant Theresa Sackler was a member of Purdue's Board from 1993 through 2018. She resides in New York and the United Kingdom. At all times material to this Complaint, acting alone or in concert with others, Theresa Sackler formulated, directed, controlled, had the authority to control, or participated in the deceptive and unconscionable acts and practices set forth in this Complaint. As a member of Purdue's Board, she approved and oversaw deceptive and unconscionable conduct that was purposely directed at North Dakota and South Dakota and gave rise to the Standing Rock Sioux Tribe's claims as alleged in this Complaint.

2.9     Defendant David A. Sackler was a member of Purdue's Board from 2012 through 2018. He resides in New York. At all times material to this Complaint, acting alone or in concert with others, David Sackler formulated, directed, controlled, had the authority to control, or participated in the deceptive and unconscionable acts and practices set forth in this Complaint. As a member of Purdue's Board, he approved and oversaw deceptive and unconscionable conduct that was purposely directed at North Dakota and South Dakota and gave rise to the Standing Rock Sioux Tribe's claims as alleged in this Complaint.

2.10    Defendant Trust for the Benefit of Members of the Raymond Sackler Family (the "Raymond Sackler Trust") is a trust of which Defendants Beverly Sackler, Richard S. Sackler, and/or Jonathan D. Sackler are trustees. It is the 50% direct or indirect beneficial owner of Purdue and the Purdue-related entities and the recipient of 50% of the profits from the sale of opioids by Purdue and the Purdue-related entities.

<u>The Sackler Family Integrated Advertising and Medicine</u>

2.11    Given the history of opioid abuse in the U.S. and the medical profession's resulting wariness, the commercial success of the Marketing Defendants' prescription opioids

would not have been possible without a fundamental shift in prescribers' perception of the risks and benefits of opioid use.

2.12    As it turned out, Purdue Pharma was uniquely positioned to execute just such a maneuver, thanks to the legacy of a man named Arthur Sackler. The Sackler family is the sole owner of Purdue and one of the wealthiest families in America, with a net worth of $13 billion as of 2016. All of the company's profits go to Sackler family trusts and entities.  David Armstrong, *The Man at the Center of the Secret OxyContin Files*, STAT News (May 12, 2016), https://www.statnews.com/2016/05/12/man-center-secret-oxycontin-files/.  Yet the Sacklers have avoided publicly associating themselves with Purdue, letting others serve as the spokespeople for the company.

2.13    The Sackler brothers—Arthur, Mortimer, and Raymond—purchased a small patent-medicine company called the Purdue Frederick Company in 1952. It was Arthur Sackler who created the pharmaceutical advertising industry as we know it, laying the groundwork for the OxyContin promotion that would make the Sacklers billionaires.

2.14    Arthur Sackler was both a psychiatrist and a marketing executive. He pioneered both print advertising in medical journals and promotion through physician "education" in the form of seminars and continuing medical education courses. He also understood the persuasive power of recommendations from fellow physicians, and did not hesitate to manipulate information when necessary. For example, one promotional brochure produced by his firm for Pfizer showed business cards of physicians from various cities as if they were testimonials for the drug, but when a journalist tried to contact these doctors, he discovered that they did not exist.  Barry Meier, *Pain Killer: A "Wonder" Drug's Trail of Addiction and Death* (Rodale 2003) (hereinafter "Meier"), at 204.

2.15    It was Arthur Sackler who, in the 1960s, made Valium into the first $100-million drug, so popular it became known as "Mother's Little Helper." When Arthur's client, Roche, developed Valium, it already had a similar drug, Librium, another benzodiazepine, on the market for treatment of anxiety. So Arthur invented a condition he called "psychic tension"—essentially stress—and pitched Valium as the solution. *Id*. at 202; *see also One Family Reaped Billions From Opioids*, WBUR On Point (Oct. 23, 2017), http://www.wbur.org/onpoint/2017/10/23/one-family-reaped-billions-from-opioids.  The campaign, for which Arthur was compensated based on volume of pills sold, was a remarkable success.   Meier, *supra*, at 201-203.

2.16    Arthur Sackler created not only the advertising for his clients but also the vehicle to bring their advertisements to doctors—a biweekly newspaper called the Medical Tribune, which was distributed for free to doctors nationwide. Arthur also conceived a company now called IMS Health Holdings Inc., which monitors prescribing practices of every doctor in the United States and sells this valuable data to pharmaceutical companies like Marketing Defendants, who utilize it to target and tailor their sales pitches to individual physicians.

<u>Purdue and the Development of OxyContin</u>

2.17    After the Sackler brothers acquired the Purdue Frederick Company in 1952, Purdue sold products ranging from earwax remover to antiseptic, and it became a profitable business. As an advertising executive, Arthur Sackler was not involved, on paper at least, in running Purdue, which would have been a conflict of interest. Raymond Sackler became Purdue's head executive, while Mortimer Sackler ran Purdue's UK affiliate.

2.18    In the 1980s, Purdue, through its UK affiliate, acquired a Scottish drug producer that had developed a sustained-release technology suitable for morphine. Purdue marketed this

extended-release morphine as MS Contin, and it quickly became Purdue's bestseller. As the patent expiration for MS Contin loomed, Purdue searched for a drug to replace it. Around that time, Raymond's oldest son, Richard Sackler, who was also a trained physician, became more involved in the management of the company. Richard had grand ambitions for the company; according to a long-time Purdue sales representative, "Richard really wanted Purdue to be big—I mean really big." Christopher Glazek, *The Secretive Family Making Billions from the Opioid Crisis*, Esquire (Oct. 16, 2017), http://www.esquire.com/news-politics/a12775932/sackler-family-oxycontin/. Richard believed Purdue should develop another use for its "Contin" timed-release system.

2.19 In 1990, Purdue's vice president of clinical research, Robert Kaiko, sent a memo to Richard and other executives recommending that the company work on a pill containing oxycodone. At the time, oxycodone was perceived as less potent than morphine, largely because it was most commonly prescribed as Percocet, a relatively weak oxycodone-acetaminophen combination pill. MS Contin was not only approaching patent expiration but had always been limited by the stigma associated with morphine. Oxycodone did not have that problem, and what's more, it was sometimes mistakenly called "oxycodeine," which also contributed to the perception of relatively lower potency, because codeine is weaker than morphine. Purdue acknowledged using this to its advantage when it later pled guilty to criminal charges of "misbranding" in 2007, admitting that it was "well aware of the incorrect view held by many physicians that oxycodone was weaker than morphine" and "did not want to do anything 'to make physicians think that oxycodone was stronger or equal to morphine' or to 'take any steps . . . that would affect the unique position that OxyContin'" held among physicians. *Id*.

<u>The Sackler Family and Purdue's Board of Directors</u>

2.20     Eight people in a single family made many of the choices that caused much of the 'opioid epidemic: Richard Sackler, Jonathan D. Sackler, Ilene Sackler Lefcourt, Kathe Sackler, Beverly Sackler, Mortimer D.A. Sackler, Theresa Sackler, and David Sackler (collectively, "the Sacklers"). The Sacklers' ambition was to become unimaginably rich from the sale of opioids. To that end, they masterminded a strategy, carried out by Purdue, that changed the way the medical profession viewed opioid prescribing. Purdue exploited newly emerging concerns in the profession that pain was an undertreated priority. Purdue helped to institutionalize this patient centric shift, and then capitalized on the platform it had created to push its message that health care providers should prescribe more opioids to treat this undertreated chronic pain. Purdue designed an array of deceptive messages that reduced concerns about the addictive nature of opioids. Purdue's massive marketing scheme, which occurred alongside similar efforts of other industry players, was profoundly successful at shifting the medical and public consensus regarding the use of opioids.

2.21     Defendants controlled Purdue's misconduct. Each of them took a seat on the Board of Directors of Purdue Pharma Inc. Together, they always held the controlling majority of the Board, which gave them full power over the Purdue entities, including Purdue Pharma L.P. They directed deceptive sales and marketing practices deep within Purdue.

2.22     The Sacklers well understood the addictive and dangerous qualities of the drugs they manufactured, but the risks presented by their drugs to individual consumers or public health did not constrain their marketing and promotional plans. The Sacklers set sales objectives and shaped the marketing campaigns that Purdue carried out to meet them. The Sacklers directed and approved the hiring of hundreds of workers to carry out their wishes and blanketed the

country with disinformation about opioids. The Sacklers directed Purdue employees to get more patients on opioids, at higher doses, for longer periods of time, and the company did exactly these things. And over the years, the Sacklers distributed billions of dollars earned from the sale of Purdue opioids to themselves and other family members.

2.23    The Sacklers' callousness is apparent on the face of internal planning documents. As reports of overdoses and deaths flowed into the company, the Sacklers sought to protect their profits by blaming addicts and doubling down on Purdue's aggressive marketing tactics. Once the opioid epidemic had undeniably materialized and opioid prescribing began to decline, the Sacklers planned to replace lost revenue by moving into new product ventures: drugs to treat opioid overdose and opioid addiction. This expansion was characterized as the logical coverage of a "spectrum" in which Purdue could be the "end-to-end pain provider."

2.24    The Sacklers were, in the words of one long-time company executive, the "de facto CEO" of Purdue. As set forth below, Defendants are personally liable for Purdue's misconduct because    (a) they personally directed, approved, or participated in certain of the misconduct and (b) they knew about and sanctioned other misconduct, including by failing to stop it. Defendants made the decisions to break the law; they controlled the unfair and deceptive conduct; and they personally collected hundreds of millions of dollars from the deception.

2.25    In the mid-2000s, federal and state law enforcement began investigating Purdue for deceptively marketing and misbranding OxyContin. During the time period covered by the investigation, at least three Sackler board members were among the highest executives inside the company: Richard Sackler was Chief Executive Officer, and Jonathan and Kathe Sackler were Vice Presidents. As explained below, they and their family members were intimately involved in

the launch of OxyContin and the marketing campaigns that led to the explosion of overprescribing.

2.26    The investigations culminated in a series of settlements in 2007 under which Purdue and three of its now-former executives (but none of the Sackler family members) pleaded guilty to federal criminal charges for certain deceptive conduct in the sale and marketing of opioids. Purdue paid more than $650 million in fines, forfeitures, and settlement of civil claims. The Sacklers decided which executives would offer guilty pleas, approved the settlement agreements, and then drew back from their roles as employees of the company to serve exclusively on the Board of Directors. As described below, in the years that followed the Sacklers approved several large payments-in the millions of dollars-to the executives who pled guilty. At the same time, the Sacklers continued to manage the company's core business activities - marketing, sales, and product development.

2.27    From 2007 into 2018, the Sacklers directed and approved the hiring of a large sales force. They were deeply involved in guiding the strategy behind the marketing plans that directed these representatives. The Sacklers met regularly as members of the Board of Directors and received detailed briefings from the staff not just on the company's finances, but on the size, distribution, daily activities, tactics, and compensation of the sales force. The Sacklers approved routine increases in the number of sales representatives and increases to their compensation, all while receiving detailed briefings on the contents of representatives' sales pitches and delivering unequivocal orders to meet the family's strategic imperatives: visit prescribers more frequently, and convince them to write more opioid prescriptions, over longer periods of therapy, at increasingly high doses.

2.28    In pursuit of the objectives set by the Sacklers, Purdue's sales representatives consistently misrepresented and otherwise minimized the risk of addiction to OxyContin and Purdue's other opioids, including by claiming that signs of addiction merely reflect undertreated pain, and overstating doctors' ability to avoid drug abuse through screening tools and abuse deterrent formulations. They also falsely claimed that OxyContin was effective for 12 hours, a marketing tactic that left users with end-of-dose cravings that fueled higher doses and addiction.

2.29    Purdue's sales representatives carried out several additional unconscionable schemes devised by the Sacklers to fortify the family's revenue stream. First, they set out to capture new initiates: the elderly and the "opioid naive" (those who have not previously used these powerful drugs). Second, they promoted the routine and speedy escalation of doses under the guise of "individualized dosing"-to increase sales of Purdue's more expensive products. And third, they encouraged long-term use-i.e., a steady stream of returning customers.  They did so despite the evidence that serial prescriptions were more likely to induce dependence and addiction.

2.30    The Sacklers are now poised to profit from the public health crisis that they created. Richard Sackler was awarded a patent in January 2018 for a new formulation of buprenorphine-one of the most effective drugs used to treat opioid addiction. In his patent application, Dr. Richard Sackler described the background of his new invention:

> Over the last decades, prejudices in the medical community as to the use of strong opioids for treating chronic pain in patients has significantly decreased. Many of these prejudices were due to some of the characteristics being inherent to opioids. While opioids have always been known to be useful in pain treatment, they also display an addictive potential in view of their euphorigenic activity. Thus, if opioids are taken by healthy human subjects with a drug seeking behavior, they may lead to psychological as well as physical dependence.

2.31    The application goes on to link addiction to crime before presenting his invention-in an echo of OxyContin marketing-as less prone to diversion and abuse than other treatment drugs. Buprenorphine sales in the United States topped $2.6 billion in 2017, and are expected to rise as the infrastructure and funding for addiction treatment expands to meet current and projected needs.

2.32    Purdue's deceptive marketing has reaped massive revenues for the company, and massive wealth for the Sacklers, but has imposed catastrophic harms. By exaggerating the benefits of chronic opioid therapy and downplaying its very serious risks, the Sacklers and Purdue maintained the market that they largely created. As recently as 2015, Purdue reaped an estimated $3 billion annually in revenue nationwide, virtually all of it from the sale of opioids.

2.33    Even today, at the height of the opioid epidemic, the Sacklers seek to obscure their culpability for this crisis. The Sacklers have tried to distance themselves from their company, and have directed Purdue to distance itself from its past misconduct. The Sacklers approved corporate messaging intended to portray Purdue as a responsible corporate citizen by depicting the opioid epidemic as principally a problem of illicit drug diversion and abuse, not overprescribing and addiction; falsely promoting the safety of Purdue's abuse-deterrent formulations; and touting Purdue's efforts to rein in diversion, even as the company failed to meaningfully investigate or report suspicious prescribing. The Sacklers received regular updates on just how many reports of suspicious prescribing-"Reports of Concern"-were coming into the company, but stood by as Purdue failed to report nearly all of these to authorities. And the Sacklers hid behind the perception that they were a normal board, one that was not steeped in the details of Purdue's marketing but merely approved budgets and broad strategies.

2.34    In reality, the Sacklers were the architects and drivers of Purdue's promotional efforts. The Sacklers' communications were not limited to quarterly Board meetings. They were in touch with Purdue marketing employees throughout the year, at some points daily and on weekends-to the point that Purdue executives and staff felt harassed. The Sacklers' personal involvement in the running of the company was so long- and well-established that an implausible effort, in 2017, to issue a press statement denying the family's involvement in the company's affairs was abandoned. The initial draft statement-"Sackler family members hold no leadership roles in the companies owned by the family trust"-was watered down to "Sackler family members hold no management positions."

2.35    The Sacklers knowingly and intentionally sent sales representatives to promote opioids to prescribers hundreds of thousands of times. The Sacklers knew and intended that the sales representatives would deceptively and misleadingly promote opioid sales, including by overstating the benefits and understating the risks. The Sacklers knew and intended that prescribers, pharmacists, and patients in would rely on Purdue's deceptive sales campaign to prescribe, dispense, and take Purdue opioids; securing that reliance was the purpose of the sales campaign. And the Sacklers knowingly and intentionally took money from Purdue's deceptive business, distributing billions of dollars in Purdue profits to themselves and other family members over the years.

2.36    Defendants Richard S. Sackler, Jonathan D. Sackler, Mortimer D.A. Sackler, Kathe A. Sackler, Ilene Sackler Lefcourt, Beverly Sackler, Theresa Sackler, David A. Sackler, and Raymond Sackler Trust are "Manufacturer Defendants" as used in the Tribe's Complaint. Plaintiff adopts all allegations and causes of action alleged against the Manufacturer Defendants in its Complaint against these defendants as if fully set forth herein

2.37    AbbVie, Inc. is a Delaware Corporation with its principal place of business in North Chicago, Illinois.

2.38    AmerisourceBergen Drug Corporation is a Delaware Corporation with its principal place of business in Chesterbrook, Pennsylvania.    Amerisource distributes pharmaceuticals to retain pharmacies and institutional providers across the United States, including in North Dakota and South Dakota.

2.39    Anda, Inc. is a Florida corporation with its principal office located in Olive Branch, Mississippi.

2.40    Anoka, LLC was a Minnesota limited liability company with a principal place of business in Maple Grove, MN.

2.41    D&K Healthcare Resources is a Delaware limited liability company with a principal place of business in St. Louis, Missouri.

2.42    Dakota Drug, Inc. is a North Dakota corporation with its principal place of business in Minot, North Dakota.

2.43    KVK-Tech, Inc. is a Pennsylvania corporation with its principal place of business in Newtown, Pennsylvania.

2.44    Lannett Company, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Philadelphia, Pennsylvania.

2.45    Ligand Pharmaceuticals, Inc. is a Delaware corporation with a principal place of business in San Diego, California.

2.46    Morton Grove Pharmaceuticals, Inc. is a Delaware corporation with a principal place of business in St. Louis City, Missouri.

2.47     Mylan Pharmaceuticals, Inc. is a Pennsylvania corporation with its principal place of business located in Canonsburg, Pennsylvania.

2.48     Par Pharmaceutical, Inc. is incorporated in New York with a principal place of business in Chestnut Ridge, New York.

2.49     Rhodes Pharmaceuticals, L.P. is a Delaware limited partnership with a principal place of business in Coventry, Rhode Island. Rhodes Pharmaceuticals, Inc. is a New York corporation with a principal place of business in New York.

2.50     Sandoz, Inc. is a Colorado Corporation with a principal place of business in Princeton, New Jersey.

2.51     SpecGx, LLC, is a Delaware limited liability company with its headquarters in Clayton, Missouri and is a wholly-owned subsidiary of Mallinckrodt plc.

2.52     Sun Pharmaceutical Industries, Inc. is a Michigan corporation with a principal place of business in Cranbury, New Jersey.

2.53     Thrifty Drug Stores, Inc. d/b/a Thrifty White Warehouse, is a Minnesota company with a principal place of business in Plymouth, Minnesota.

2.54     Walgreen Co is a Delaware corporation with its principal place of business in Illinois.

2.55     Wal-Mart Stores, Inc. is a Delaware corporation with its principal place of business in Arkansas.

2.56     West-Ward Pharmaceuticals Corp. is a Delaware corporation with its principal place of business located in Eatontown, New Jersey.

2.57     White Drug 61 is a Minnesota company with a principal place of business in Plymouth, Minnesota.

2.58    Zydus Pharmaceuticals (USA) Inc. is a New Jersey corporation with its principal place of business in New Jersey.

## COMMON FACTUAL ALLEGATIONS

3.    By checking the boxes in this section, Plaintiff hereby incorporates by reference to this document the common factual allegations set forth in the *Tribal Bellwether Plaintiffs'* Pleadings as identified in the Court's Order implementing the Tribal Plaintiff Short Form procedure.  Doc. #1742.

***Muscogee (Creek) Nation's* First Amended Complaint, (Doc. 731, 1:17-md-02804)**:
- ☒ Common Factual Allegations (¶¶96-98)
- ☒ Common Factual Allegations - Marketing Manufacturers (¶¶99-156)
- ☐ Common Factual Allegations - Generic Marketing Manufacturers (¶¶157-161)
- ☒ Common Factual Allegations - Diversion Defendants (¶¶162-165)
- ☒ Common Factual Allegations - Diversion Defendants and Distributor Defendants (¶¶166-169, 200-211)
- ☒ Common Factual Allegations - Distributor Defendants (¶¶212-223, 230-236)
- ☐ Common Factual Allegations - Pharmacy Defendants (¶¶170-177, 237-262)
- ☒ Common Factual Allegations - Diversion Manufacturer Defendants (¶¶224-229)
- ☒ Common Factual Allegations - RICO Marketing Enterprise (¶¶295-328)
- ☒ Common Factual Allegations - RICO Supply Chain Enterprise (¶¶329-352)

***The Blackfeet Tribe of the Blackfeet Indian Reservation's* Corrected First Amended Complaint (Redacted), (Doc. 9, 18-op-45749):**
- ☒ Common Factual Allegations (¶¶99-143, 480-585, 636-650, 721-735)
- ☒ Common Factual Allegations - Marketing Defendants (¶¶144-468, 701-720, 736-763)
- ☒ Common Factual Allegations - Distributor Defendants (¶¶469-473)
- ☒ Common Factual Allegations - Supply Chain Defendants (¶¶474-479)
- ☐ Common Factual Allegations - National Retail Pharmacy Defendants (¶¶586-635)
- ☒ Common Factual Allegations - RICO Marketing Enterprise (¶¶764-798)
- ☒ Common Factual Allegations - RICO Supply Chain Enterprise (¶¶799-827)

4.    If additional claims are alleged below that were not pled in Plaintiff's Existing Complaint (other than the RICO claims asserted herein), the facts supporting those allegations must be pleaded here. Plaintiff asserts the following additional facts to support the claims identified in Paragraph 6 below (below or attached):

## **CLAIMS**

5. The following federal **RICO causes of action** asserted in the *Tribal Bellwether Plaintiffs'* Pleadings as identified in the Court's implementing order and any subsequent amendments, are incorporated in this Short Form by reference, in addition to the causes of action already asserted in the Plaintiff's Existing Complaint (check all that apply):

☒ First Claim for Relief – Violation of RICO, 18 U.S.C. § 1961 *et seq.* – Opioid Marketing Enterprise (Against the "Marketing Manufacturer Defendants") (*Muscogee (Creek)* Pleadings, Paragraphs 353-379)

☒ First Claim for Relief – Violation of RICO, 18 U.S.C. § 1961 *et seq.* – Opioid Marketing Enterprise (Against Defendants Purdue, Cephalon, Janssen, Endo and Mallinckrodt (the "RICO Marketing Defendants")) (*Blackfeet* Pleadings, Paragraphs 828-855)

☒ Second Claim for Relief – Violation of RICO, 18 U.S.C. § 1961 *et seq.* – Opioid Supply Chain Enterprise (Against All Defendants) (*Muscogee (Creek)* Pleadings, Paragraphs 380-408)

☒ Second Claim for Relief – Violation of RICO, 18 U.S.C. § 1961 *et seq.* – Opioid Supply Chain Enterprise (Against Defendants Purdue, Cephalon, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, and AmerisourceBergen (the "RICO Supply Chain Defendants")) (*Blackfeet* Pleadings, Paragraphs 856-887)

6. Plaintiff asserts the following **additional claims** as indicated (below or attached):

_____
_____
_____
_____

7. To the extent Plaintiff wishes to **dismiss claims** previously asserted in Plaintiff's Existing Complaint, they are identified below and will be dismissed without prejudice.

_____
_____
_____

WHEREFORE, Plaintiff prays for relief as set forth in the *Tribal Bellwether* Pleadings in *In Re National Prescription Opiate Litigation* in the United States District Court for the Northern District of Ohio, MDL No. 2804 and in Plaintiff's Existing Complaint as has been amended herein.

Dated:  08/09/2019                                  **ROBINS KAPLAN LLP**

By:  *s/ Timothy Q. Purdon*
Timothy Q. Purdon (ND #05392)
1207 West Divided Avenue, Suite 200
Bismarck, ND 58503
T: (701) 255-3000
F: (612) 339-4181
TPurdon@RobinsKaplan.com

Tara D. Sutton (MN 23199X)
Holly H. Dolejsi (MN 0390110)
Shira T. Shapiro (MN 0390508)
Sarah E. Friedricks (MN 0397466)
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
T: (612) 349-8500
F: (612) 339-4181
TSutton@RobinsKaplan.com
HDolejsi@RobinsKaplan.com
SShapiro@RobinsKaplan.com
SFriedricks@RobinsKaplan.com

Brendan V. Johnson (SD 3263)
140 North Phillips Avenue, Suite 307
Sioux Falls, SD 57104
T: (605) 335-1300
F: (612) 339-4181
BJohnson@RobinsKaplan.com

*Attorneys for Plaintiff Standing Rock Sioux Tribe*